**AFFIDAVIT IN SUPPORT OF A**
**CRIMINAL COMPLAINT AND ARREST WARRANT**

This affidavit is submitted by Special Agent Michael M. Clarke in support of a criminal complaint and an application for an arrest warrant relating to:

**ZUBAYAR AL-BAKOUSH** (hereinafter referred to as "BAKOUSH"), a Libyan national last known to reside in Benghazi, Libya.

I respectfully submit that there is probable cause to believe that the above-identified individual has committed the following criminal offenses in violation of United States law:

1. Killing A Person in the Course of an Attack on a Federal Facility Involving the Use of a Firearm and Dangerous Weapon and Attempting and Conspiring to Do the Same, in violation of 18 U.S.C. §§ 930(c) and 2;

2. Providing, Attempting and Conspiring to Provide Material Support to Terrorists Resulting in Death, in violation of 18 U.S.C. §§ 2339A and 2; and

3. Discharging, Brandishing, Using, Carrying and Possessing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1) and 2.

**AFFIANT'S BACKGROUND**

1. I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since August 1988. I began my career as a Special Agent in the Atlanta Field Office, focusing on organized crime, gang and public corruption investigations. In May 2001, I transferred to the San Juan Division, where I was promoted to Supervisory Special Agent ("SSA"). As the SSA, I was responsible for supervising an International Liaison Office and two FBI Resident Agencies, the Joint Terrorism Task Force and the Safe Streets Task Force. In May 2005, I was selected by the FBI Director to open a new FBI Legal Attaché Office in the Balkans with territorial responsibilities for Albania, Macedonia and Bulgaria. As a Legal Attaché, I supervised and/or initiated hundreds of foreign police cooperation matters and operational leads in all FBI priority programs. In June 2008, I returned from overseas duty and was assigned as the Senior FBI Liaison Officer to the Joint Interagency Task Force South, United States Southern Command, Key West, Florida. In July 2012, I transferred to the FBI's New York Office and was assigned to an extraterritorial squad with investigative responsibilities for Africa.

2. As a Special Agent, I have participated in hundreds of international investigations involving violations of U.S. criminal and terrorism laws. I have employed countless investigative tools in furtherance of these investigations, including search warrants, arrest warrants, wiretaps, undercover operations, witness interviews, and the use of confidential informants and cooperating co-conspirators. I have also received specialized training in international counterterrorism investigations. Prior to my position as a Special Agent, I was employed as a police officer in the state of New Jersey.

3. I have personally participated in this investigation and have witnessed many of the facts and circumstances described herein. I have also received information from other federal and foreign law enforcement officials relating to this investigation. The statements contained in this affidavit are based on my own observations, witness interviews, document reviews and reliable information provided to me by other federal and foreign law enforcement officials. Because this affidavit is submitted for the purpose of seeking the issuance of a criminal complaint and arrest warrant, it does not include every fact known to me concerning the investigation.

## FACTS SUPPORTING PROBABLE CAUSE

### Background

4. The country of Libya is located in North Africa along the Mediterranean Sea. Its capital is Tripoli. Benghazi, Libya's second largest city, is located in the northeastern part of the country, approximately 400 miles east of Tripoli.

5. In 1969, Muammar Gaddafi seized power in Libya through a coup and remained Libya's leader until 2011, at which time a civil war broke out. The civil war began in the city of Benghazi. In August 2011, as a result of the civil war, Gaddafi was ousted from power. Libya has since been ruled by various governments.

6. In November 2011, the United States established a diplomatic outpost in the city of Benghazi, referred to as the U.S. Special Mission ("Mission"). The Mission consisted of several structures, including a large villa ("Villa C"), which housed the main living area and residence; Villa B, which included a cafeteria; a guard house, which included sleeping quarters for locally employed guards; and an "Office," which included a Tactical Operations Center ("TOC"). The Mission was surrounded by a perimeter wall which was approximately eight feet high. Access could be gained to the Mission through one of three gated entrances. The Mission's main gate, which was referred to as the C-1 gate, was located on the north wall of the Mission. Access to the Mission was typically gained through the C-1 gate from a dirt road that ran along the northern wall of the Mission. Also on the northern wall and just east of the C-1 gate was a second gate, referred to as the B-1 gate. It was rarely used by the Mission personnel. The third gate was located on the southern wall of the Mission directly south of the C-1 gate. It was referred to as the C-3 gate. Access could be gained through the C-3 gate from Fourth Ring Road (which was also called Venecia Road). Additionally, the security apparatus included local guards, armed and unarmed, as well as security cameras placed throughout the Mission. The camera surveillance could be viewed from the TOC.

7. The Mission was typically occupied by a small contingent of U.S. Department of State personnel, including Special Agents from the Diplomatic Security Service ("DSS"). On September 11, 2012, it was occupied by seven U.S. citizens, including the U.S. Ambassador to Libya, John Christopher Stevens, Department of State Information Management Officer ("IMO") Sean Patrick Smith, and five DSS agents.

8. A second U.S. facility, hereinafter referred to as the "Annex," was located in the vicinity of the Mission. It, too, was occupied by employees of the U.S. government, including Tyrone Snowden Woods, who provided security for the Annex and its personnel, and Glen Anthony Doherty, who responded to the Annex from Tripoli after the attack began.

9. The Mission and Annex were both Federal facilities within the meaning of Title 18, United States Code, Section 930(g)(1), that is, both of these facilities were buildings or parts thereof leased by the Federal Government, where Federal employees were regularly present for the purpose of performing their duties.

### Attacks on the Mission and Annex

10. On the evening of September 11, 2012, a large group of heavily armed men began an attack on the Mission, which was followed by an attack on the Annex. The attack on the Annex continued through the morning of September 12, 2012. Four U.S. citizens were killed as a result of these attacks. In an effort to reconstruct the events of that evening, the FBI interviewed the DSS agents who were stationed at the Mission, the U.S. personnel stationed at the Annex, as well as other witnesses. I personally participated in many of these interviews. Additionally, I examined physical evidence related to these attacks and reviewed the video surveillance that was captured by the Mission's security cameras. Based on this information, I know that these attacks occurred in the following manner:

11. On the evening of September 11, 2012, the Mission was occupied by seven U.S. citizens, including Ambassador Stevens, IMO Smith and five DSS agents. At approximately 9:45 p.m., the occupants heard gunfire, a loud explosion and chanting in the vicinity of the Mission's main gate.

12. The DSS agents reacted immediately to what appeared to be an attack on the Mission. One DSS agent remained in the TOC where he maintained surveillance on the attackers and communications. A second DSS agent located Ambassador Stevens and IMO Smith and secured them in a safe haven within the residence portion of Villa C. The remaining three DSS agents responded to their bedrooms to retrieve their survival bags and rifles.

13. At this point, a group of 20 or more men, many of whom were armed with AK-47-type assault rifles, were seen just outside the main gate of the Mission. The group of men aggressively rushed the main entrance and gained access to the Mission. The DSS agent in the TOC estimated that he observed through the surveillance cameras approximately 30 men within the compound. Many of these individuals were armed and were observed running through the compound, discharging their weapons, forcibly attempting to gain access to the compound's buildings, and defacing and looting property within the compound. Of the three agents who retrieved their rifles, two attempted to return to Ambassador Stevens in Villa C. They were turned back by a number of armed intruders within the compound and the two agents temporarily took sanctuary in Villa B. The third agent who went to retrieve his rifle responded to the TOC, where he and another agent called U.S. and Libyan contacts, advising them of the attack and requesting assistance. They also continued to monitor the attackers through the surveillance cameras.

14. The remaining DSS agent, Ambassador Stevens and IMO Smith secured themselves in the safe haven within Villa C. A large metal gate separated the area of the villa containing the bedrooms and safe haven from the rest of the structure. Armed attackers were seen entering the villa and attempting to gain access to the portion of the villa secured by the metal gate and containing the bedrooms and safe haven.

15. Throughout the attack, all of the agents heard automatic weapons and rocket-propelled grenades ("RPGs") being fired and grenades exploding within and in the vicinity of the Mission. The attackers set several vehicles and buildings within the Mission on fire, including the guard house and Villa C, which housed the safe haven.

16. The DSS agent within the safe haven noticed that Villa C had been set on fire. Villa C quickly filled with black smoke, making it difficult to see and breath. The DSS agent attempted to escort Ambassador Stevens and IMO Smith out of Villa C through a window. The DSS agent was able to reach and open a bedroom window; however, he lost contact with Ambassador Stevens and IMO Smith. The agent reentered the burning villa on several occasions in an effort to locate Ambassador Stevens and IMO Smith. His attempts proved unsuccessful. The agent, who was taking fire, extricated himself to the roof of Villa C.

17. The three DSS agents who had retrieved their rifles returned to Villa C in an armored vehicle. They made contact with the DSS agent who had made his way to the villa roof. The agents repeatedly reentered the villa in an attempt to locate Ambassador Stevens and IMO Smith. They were able to locate the body of IMO Smith. He had no pulse and appeared to have succumbed to smoke inhalation.

18. As the DSS agents were searching Villa C, a group of security personnel from the Annex arrived at the Mission and assisted in the search effort and evacuation from the compound. A local militia also responded to the Mission in order to render assistance to the Mission personnel. The five agents evacuated the Mission in an armored vehicle and headed toward the Annex. While en route, their vehicle was damaged from extensive gunfire it sustained from armed men standing outside the Mission. The agents arrived at the Annex at approximately 11:30 p.m.

19. The Annex security personnel remained at the Mission and continued to search for Ambassador Stevens. The local militia leader, a portion of whose force accompanied the Annex personnel, requested that the Annex personnel leave the compound due to the deteriorating security situation. The Annex personnel eventually departed the Mission and arrived at the Annex at approximately midnight with IMO Smith's body.

20. Shortly after their arrival, the Annex was attacked by individuals armed with automatic weapons and RPGs. The Annex occupants were able to repel the initial attack. An additional security team had been dispatched from the U.S. Embassy in Tripoli and arrived in Benghazi after midnight. At approximately 5:00 a.m., the Tripoli security team arrived at the Annex. Approximately 15 minutes later, the Annex was attacked by mortar

fire, killing two U.S. employees – Tyrone Snowden Woods, who was stationed at the Annex, and Glen Anthony Doherty, who had just arrived with the Tripoli security team. Woods and Doherty were both U.S. citizens. The mortar fire also seriously injured several U.S. citizens within the Annex compound, including one of the DSS agents.

21. The Mission and Annex personnel were subsequently evacuated from the Annex to the Benghazi Airport. They were escorted by an armed convoy consisting of local militia members. While at the airport, local militia members brought them the body of Ambassador Stevens. He too appeared to have died from smoke inhalation. The Mission and Annex personnel were airlifted out of Benghazi.

22. The bodies of the Americans who were killed in these attacks were transported to the Department of Defense Armed Forces Medical Examiner System in Dover, Delaware, for autopsies, which revealed the following causes and manners of death: Ambassador Stevens and IMO Smith died of carbon dioxide poisoning, which is consistent with death by smoke inhalation. Tyrone Woods and Glen Doherty died of ballistic injuries, which is consistent with death by mortar fire. The medical examiner ruled that the manner of death for all four victims was homicide.

**Video Evidence of the Attack**

23. The video of the attack that was captured by the Mission's surveillance cameras was recorded on a digital video recorder. The FBI has obtained the recording, which will hereinafter be referred to as the video footage. The video footage shows a number of events occurring in multiple locations in and around the Mission throughout the attack. I had the opportunity to review the video footage, and below, I describe some of the more significant events that were captured during the attack by the Mission's video surveillance. On occasion, I have included my conclusions about the events based on witness interviews, many of which I personally participated in.

   a. A surveillance camera at the Mission's main gate (C-1) shows that, at 9:45 p.m., a group of 20 or more men assembled outside the Mission. On the video footage, many men appear to be armed with AK-47-type assault rifles. There appears to be an explosion near the security camera, which could be an attempt by the attackers to destroy the camera by gunfire or some other explosive device. The lighting outside the gate is good, so the faces, physical characteristics, clothing and weapons of the attackers are clearly visible on the video footage. The group's attention is focused on the main gate (C-1) entrance. The men can be seen talking and gesturing to each other as they appear to be gathering to surge through the gate. One of the individuals is displaying a black flag with white writing, which I know is consistent with banners displayed by Islamic extremist groups. One of the attackers appears to be carrying a small object which bears an image of the U.S. flag. The attacker appears to place the object onto the ground, and another individual appears to stomp on it. Shortly after the apparent explosion near the security camera, the group rushes together toward the C-1 entrance and then surges through it. Many attackers are seen gaining access to the Mission, including

5

attackers identified as Subject F and Subject G. Subject F is seen wearing camouflaged pants, a dark short-sleeved shirt and a military-style vest. Subject G is seen as a stocky man with a thin beard, dressed in a black shirt and black jeans. Subject G does not appear to be armed at first. He appears to be acting in concert with the other attackers. He is visible standing among several of the armed attackers, some of whom have been identified previously. Subject G appears to walk toward another attacker who appears to put a handgun inside a back pocket of his pants. The attacker also appears to be armed with a rifle. Subject G appears to walk with the attacker. While he is walking with the attacker, Subject G appears to take the handgun from the attacker and then appears to move toward the C-1 entrance with the other attackers as they breach the Mission. I mention Subject F because he is seen throughout the attack. He has also been identified by name. I will continue to reference Subject F and G to show, among other things, that the attack on the Mission was one ongoing event.

b. At 9:46 p.m., the video shows two armed men within the Mission approaching the C-3 gate. One of the men opens the gate. In an apparent theft from the Mission, an SUV-type vehicle is seen driving out of the Mission through gate C-3.

c. At 9:50 p.m., two armed men are observed outside the Office. They are pointing rifles in the direction of what appears to be bushes or a structure. A man appears from this location with his hands up as if he is surrendering. At 9:54 p.m., two armed men are seen walking toward Villa C. They appear to be escorting a man between them as if he is in their custody. They also appear to strike this man. From interviews that were conducted, I believe that the man who was taken into custody and mistreated by the attackers was one of the Mission's local guards.

d. At 9:57 p.m., an explosion can be seen in the location of the Mission's guard house, which is located within the compound near the C-1 gate. The guard house catches fire and continues to burn throughout the evening.

e. At 10:01 p.m., a large group of armed men appears to be coming from the C-1 gate area and moving toward the center of the Mission compound. One of the men is carrying a fuel container or gas can. A man, who appears to be wearing a similar shirt and vest and appears to have similar hair as the man identified as BAKOUSH (*see* ¶ 26 *infra*), follows closely behind this group. The group enters a courtyard between Villa B and the Office. The man with the gas can appears to pour liquid onto two vehicles parked outside the Office. Another man, who appears to be Subject F, walks behind the man with the gas can and is seen striking one of the vehicles several times with a baton.

f. Also at 10:01 p.m., a man, armed with a handgun, attempts to kick in the door of Villa B. At 10:02 p.m., after several attempts, he successfully kicks in the door and enters Villa B. He is followed into Villa B by more than ten individuals, most of whom are armed with AK-47-type assault rifles and one of whom is seen

       carrying a gas can. Several of the armed men are seen removing various items from Villa B.

    g. At approximately 10:03 p.m., the video depicts three men make more than fifteen unsuccessful attempts to force open the door to the Office. They are seen kicking the door and throwing their bodies against the door. The door does not budge. An armed man remains outside the Office door. At approximately 10:05 p.m., BAKOUSH, with what appears to be a firearm slung over his shoulder, is seen in the vicinity of the door to the Office. (*See* ¶26, *infra*.) At 10:07 p.m., approximately three to five men repeatedly kick and throw their bodies against the Office door in an attempt to force it open. One of these individuals is Subject F. He is seen placing several items on the ground, which he appears to have looted from the Mission. He then runs into the Office door. It does not budge. At 10:09 p.m., the majority of this group begins to disperse. They appear to return to the Villa C area and then exit through the C-1 gate. From this direction, a fireball, possibly an RPG, is seen streaking across the alley over the Mission compound toward but over the Office. At approximately 10:16 p.m., a second fireball, which again is possibly an RPG, is seen streaking in the same direction over the compound.

24. A review of the video suggests that the attackers left the interior of the compound until shortly after 11:00 p.m., when they returned and a firefight ensued. Again, the video shows the following:

    a. At 10:17 p.m., a DSS agent is seen exiting the Office, taking a defensive position behind a vehicle and then throwing a smoke grenade. He then runs to Villa B.

    b. At 10:33 p.m., three DSS agents emerge from Villa B. They move toward an SUV parked by the Office. At 10:35 p.m., an SUV is seen driving from the Office through an alley toward Villa C. Another RPG appears to streak through the air over the driveway on which the SUV is traveling. The RPG fire suggests that the attackers remain at or near the Mission just outside the compound walls. At 10:36 p.m., the SUV parks outside Villa C. The three DSS agents are observed exiting the SUV and heading toward Villa C. At least two of the agents return to the SUV to retrieve an item, possibly a rope, and then return to the Villa C. A group of men then appear outside Villa C. Several appear to be armed and they are seen interacting with the agents. Based on these observations and witness interviews, I believe that they are members of the friendly militia and the Annex security personnel that responded to the Mission.

    c. At approximately 10:47 p.m., the video shows the Annex security personnel within the compound and approaching Villa C. A group of people begins to gather outside the C-3 gate. At 10:58 p.m., three members of this group, who appear to be wearing traditional robe-like clothing ("jalabayas"), enter the compound through the C-3 gate. Members of the friendly militia approach the C-3 gate from

7

the compound's interior and appear to escort these three individuals out of the Mission compound. The friendly militia members then close the C-3 gate.

d. From approximately 11:00 p.m. to 11:05 p.m., the DSS agents and the Annex security personnel can be seen within the Mission compound, clearing the Office and then returning to the vicinity of Villa C. At 11:13 p.m., the C-3 gate opens from the inside. A group of people can be seen standing outside the C-3 gate. From the interviews, I know the DSS agents left the Mission compound at approximately 11:15 p.m. The Annex security personnel remained at the compound.

e. At 11:18 p.m., two groups can be seen at the C-3 gate. One group, which appears to be the friendly militia, is positioned just inside the Mission compound; while the second group appears just outside the compound at the C-3 gate. The friendly militia attempts to close the C-3 gate. As they close the gate, a firefight ensues, causing the friendly militia to retreat to the interior of the compound. One of the doors of the C-3 gate swings open. The group that had been outside the C-3 gate begins firing into the compound with rifles and RPGs. The firefight lasts approximately 12 minutes. The main video camera covering the C-3 gate stops operating approximately five minutes into the firefight. The Annex security personnel leaves the Mission at approximately 11:30 p.m.

f. The video does not show anyone within the compound from approximately 11:31 p.m. through 11:46 p.m. At 11:46 p.m., a group of men is observed entering the Mission from the C-3 gate area. The men appear to walk through the Mission directly to the Office. The area around the Office exterior is well lit so it is clear that many of these individuals are armed with handguns, AK-47-type assault rifles and RPGs. They are able to gain access to the Office through the door, which now appears to be unlocked. Several members of the group can then be seen entering the now-open door of the Office and gathering in the room in the Office that I know was used as both an office and a library. Additionally, Subject F appears to have returned with this group.

g. From approximately 11:48 p.m. on September 11, 2012, through 12:01 a.m. on September 12, 2012, a large group of men, most of who are armed, can be seen walking through the courtyard between the Office and Villa B and entering the Office. Subject F appears at 11:49 p.m. holding a baton. He can be seen entering the Office with a group of armed men. Subject F is then seen exiting the Office and motioning several of the armed men to move in an easterly direction. They follow his direction. Subject F returns and then reenters the Office for several minutes. He again exits the Office and walks through the courtyard. Many of the group members can be seen removing various items from the Office, including documents, files, large container–like objects and electronic equipment. The group appears to be hostile to the Mission. This is evident at 11:52 p.m., when a man is seen running out of the Office in a celebratory manner shaking an American flag in his hand, and at 11:56 p.m., when another man is seen kicking items from the

8

      Office onto the ground outside. Subject F returns at approximately 11:57 p.m. with a flashlight and is seen entering the Office for a third time.

    h. At 11:54 p.m., Subject F is in the vicinity of the Office. Other men can be seen taking various items from the Office. At 12:00 a.m., SUBJECT O is seen wearing a dark shirt and walking out of the Office carrying what appears to be rolled up maps and a laptop computer. At 12:01 a.m., while Subject F is still in the vicinity, a vehicle pulls up to the area in front of the Office. Several armed and unarmed men appear to be loading into the vehicle some of the items that had been carried out of the Office. SUBJECT O is seen walking toward the vehicle with items from the Office in hand. At approximately 12:02 a.m., the vehicle is seen leaving the area. (A vehicle of the same color, type and model was stolen from the Mission compound during the attack.)

### Identification and Actions of BAKOUSH

25. The FBI met with a Confidential Witness ("CW-18") with personal knowledge regarding facts and circumstances of the attack and the identity of persons who were involved in the attack. CW-18 is a resident of Eastern Libya, and provided the following information:

26. CW-18 was shown an array of photographs, which included a photograph of BAKOUSH. CW-18 correctly identified the photograph of BAKOUSH. Subsequently, CW-18 was shown portions of the Mission's surveillance video footage. CW-18 identified the individual seen at approximately 10:05 p.m., wearing a tan shirt, military style vest, and gold watch, with what appears to be a firearm slung over his shoulder, as BAKOUSH. (*See* ¶23g, *supra*).

27. CW-18 stated that CW-18 is familiar with BAKOUSH, having known him since Libya's revolution in 2011. From that time until 2013, CW-18 saw BAKOUSH in person on numerous occasions.

*Credibility of CW-18*

28. It is my opinion that the information provided by CW-18, including the identification of BAKOUSH, is credible. This opinion is based on several factors. I have personally met and interviewed CW-18 in connection with this investigation, and CW-18 appeared to be providing information truthfully and voluntarily. Much of what CW-18 stated about the Attack, I have been able to independently corroborate as accurate. To the best of my knowledge and belief, CW-18 has never intentionally provided any material false or misleading information to me or any other law enforcement authorities during the course of this investigation. Additionally, CW-18 advised that CW-18 is willing to continue cooperating with the United States and to testify in the United States, if necessary.

**Additional Information Relevant to the Annex Attack.**

29. Based on information I received during my investigation, I know that on September 11, 2012, the Mission Office contained security-related operational items including documents, evasion charts and maps, cell phones, diplomatic pouches and seals, several laminated cards, keys to compound vehicles, batons, computers communications information, emergency destruction check lists and laptop computers. Some of the evasion charts and maps, evacuation plans, and laminated cards contained information concerning the Annex, which was a designated escape location for the Mission, and escape routes. The escape location and escape routes are referred to, respectively, as Blue and Grey Codes. This material also identified the specific location of the Annex through its Military Grid Reference System ("MGRS") coordinates. Additionally, at least one laptop computer which was stolen from the Mission contained the specific Blue and Grey codes and the 10-digit MGRS coordinates for the Annex.

30. In an effort to identify what was taken from the Office, a portion of the Mission's surveillance video was shown to a DSS agent who was familiar with the contents of the Office on September 11, 2012. Specifically, the agent viewed video footage which depicted several men removing various items from the Office between 11:47 p.m. and 12:02 a.m. The items appeared to consist of documents, files, large rolled-up maps, container-like objects and electronic equipment. The DSS agent recognized the items that appeared to be rolled-up maps as they were being removed from the Office by SUBJECT O. He stated that the large rolled-up documents were the reference maps kept in the Office, some of which contained the Blue and Grey codes specific to the Annex evacuation point. The DSS agent also recognized some of the electronic equipment that was being carried out of the Office by SUBJECT O. He stated that it was a laptop computer that was kept in the Office and used to store sensitive information, to include evacuation plans with Blue and Grey codes and the specific MGRS coordinates of the Annex. Finally, the DSS agent recognized the car that was seen pulling up to the Office and being loaded with items taken from the Office. The DSS agent stated that the vehicle belonged to the Mission and was parked near the Office on September 11, 2012, prior to the attack.

31. Based on information received during this investigation and from several sources to include witness interviews of Department of Defense personnel, and U.S. intelligence officials, I know that having the information contained in the Special Mission Evacuation Plan, Escape and Evasion Maps, Blue and Grey codes specific to the Annex as a primary evacuation point, and the MGRS ten-digit grid coordinates for the Annex location would provide SUBJECT O and the other attackers with the necessary intelligence to conduct a precision mortar attack at night.

32. As stated above in paragraph 30, after the attack on the Mission and before the mortar attack on the Annex, an unidentified man at the AAS camp stated to Subject G that they were going to attack another location and congregate at Al-Kadiki Farm. This is evidence of pre-knowledge of the Annex attack by Subject G and other apparent AAS members.

10

**Summary of Evidence Establishing Probable Cause**

33. Based on the facts set forth herein and on my training and experience in investigating cases involving violations of federal law, I submit that there is probable cause to believe that BAKOUSH committed the above-described federal offenses. The evidence, in sum, demonstrates the following: (1) The attack on the Mission was continuous. After the initial attack at 9:45 p.m., the attackers stole a Mission vehicle, forcibly entered and damaged Mission buildings and stole Mission property. During this initial attack, buildings within the Mission were set on fire. Attackers can be seen on video surveillance carrying gas cans within the Mission, taking the gas cans into at least one of the Mission buildings and, in the presence of Subject F, pouring gasoline onto Mission vehicles. The fires that were set during the attack ultimately led to the deaths of Ambassador Stevens and IMO Smith. The attackers, including Subject F, were initially unable to breach the Mission Office. At approximately 10:10 p.m., the attackers temporarily retreated to the outside of the Mission. The evidence shows that attackers remained close to the Mission until shortly after 11:00 p.m., when they attempted to reenter through the C-3 gate. Upon their attempted reentry, a firefight ensued between the attackers and the Mission personnel (which at this point included a friendly militia and the Annex Security personnel.) Once the firefight concluded, the attackers walked directly to the Office, which notably was the last location the attackers in the first wave attempted to occupy and the only location that the initial attackers failed to occupy. Thus, the second wave of attackers appeared to act with the same purpose as the first wave of attackers. (2) At approximately midnight, SUBJECT O was seen carrying out of the Office escape and evasion maps and a laptop computer containing the grid coordinates for the Annex. (3) At approximately 10:05 p.m., BAKOUSH, while apparently armed, is seen inspecting vehicles near Villa B and walking by the Office. (4) One of the individuals at the AAS camp acknowledged that they were at the Mission to protect the Prophet and stated that the United States oppresses the Libyan people. Subject G was ordered to monitor the hospital and identify the injured people who fought against "us" at the Mission because those men should be killed. (5) An unidentified man at the AAS camp stated to Subject G that they were going to attack another location and congregate at Al-Kadiki Farm. This is evidence of pre-knowledge of the second attack by apparent AAS members. (6) SUBJECT O took the Evacuation Plan, Escape and Evasion Maps and a laptop from the Mission's Office and those items contained the MGRS ten-digit grid coordinates for the Annex location, which was identified as the Mission's primary evacuation point. Those coordinates for the Annex location could have provided SUBJECT O and the other attackers with the necessary intelligence to conduct the precision mortar attack at night that killed Tyrone Snowden Woods and Glen Anthony Doherty.

**STATUTORY PROVISIONS**

34. Title 18, United States Code, Section 930(c) makes it unlawful to kill any person in the course of possessing or causing to be present a firearm or other dangerous weapon in a

Federal facility, or in the course of an attack on a Federal facility involving the use of a firearm or other dangerous weapon, or attempting or conspiring to do such act.

35. Title 18, United States Code, Section 2339A makes it unlawful to provide material support or resources, or to attempt or conspire to do the same, knowing and intending they are to be used in preparation for and in the carrying out of a violation of Title 18, United States Code, Sections 930(c), 844(f), 1114 and 1116, among others.

36. Title 18, United States Code, Section 924(c)(1) makes it unlawful for any person, who during and in relation to a crime of violence for which a person may be prosecuted in the United States, including a violation of Title 18, United States Code, Sections 2339A, 930(c)(1), 844(f), 1114 and 1116, among others, discharges, brandishes, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm.

37. Title 18, United States Code, Section 844(f) makes it unlawful to maliciously damage or destroy, or attempt to damage or destroy, by means of fire or an explosive, any building, vehicle, or other personal or real property in whole or in part owned or possessed by, or leased to, the United States, or any department or agency thereof.

38. Title 18, United States Code, Section 1114 makes it unlawful to kill or attempt to kill any officer or employee of the United States Government (including any member of the uniformed services) while such officer or employee is engaged in or on account of the performance of official duties.

39. Title 18, United States Code, Section 1116 makes it unlawful to kill or attempt to kill a foreign official, official guest, or internationally protected person. An "internationally protected person" is further defined as "any other representative, officer, employee or agent of the United States Government, a foreign government, or international organization who at the time and place concerned is entitled pursuant to international law to special protection against attack upon his person, freedom, or dignity[.]"

40. Title 18, United States Code, Section 3238 provides that the trial of all offenses begun or committed out of the jurisdiction of any particular State or district shall be in the district in which the offender, or any one of two or more joint offenders, is arrested or first brought; but if such offender or offenders are not so arrested or brought into any district, an indictment or information may be filed in the district of the last known residence of the offender or of any one of two or more joint offenders, or if no such residence is known, the indictment or information may be filed in the District of Columbia.

## CONCLUSION

Based on the facts set forth herein, and on my training and experience in investigating cases involving violations of federal law, and on the information provided by other experienced agents with whom I have consulted, I submit that there is probable cause to believe that BAKOUSH has committed the following offenses: (1) Killing A Person in the Course of an

Attack on a Federal Facility Involving the Use of a Firearm and Dangerous Weapon and Attempting and Conspiring to Do the Same, in violation of 18 U.S.C. §§ 930(c) and 2, by killing U.S. Ambassador John Christopher Stevens, Department of State Information Management Officer Sean Patrick Smith and Security Officers Tyrone Snowden Woods and Glen Anthony Doherty; (2) Providing, Attempting and Conspiring to Provide Material Support to Terrorists Resulting in Death, in violation of 18 U.S.C. § 2339A, by participating in the attack on the U.S. Mission and the Annex, resulting in the deaths of U.S. Ambassador John Christopher Stevens, Department of State Information Management Officer Sean Patrick Smith and Security Officers Tyrone Snowden Woods and Glen Anthony Doherty; and (3) Discharging, Brandishing, Using, Carrying and Possessing a Firearm During and in Relation to a Crime of Violence, in violation of 18 U.S.C. §§ 924(c)(1) and 2.

      I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

_____
MICHAEL M. CLARKE
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to and subscribed before me on this \_\_\_\_\_ day of August 2015.

_____
HONORABLE ALAN KAY
MAGISTRATE JUDGE, U.S. DISTRICT COURT
DISTRICT OF COLUMBIA